1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                       ABILENE DIVISION

3    UNITED STATES OF AMERICA      )  CAUSE NO. 3:14-CR-014-P
                                   (
4    vs.                           )
                                   (  APRIL 24, 2014
5                                  )  DALLAS, TEXAS
     TROY E. POWELL                (  10:00 A.M.
6    _____

7

8

9    _____

10                          BENCH TRIAL

11

          BEFORE THE HONORABLE JORGE A. SOLIS
12              UNITED STATES DISTRICT JUDGE

13   _____

14

                    A P P E A R A N C E S
15

16

          FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
17                              1205 TEXAS AVENUE, 7TH FLOOR
                                LUBBOCK, TEXAS  79401
18                              (806) 472-7351
                                BY:  MR. STEVE SUCSY
19                                   MS. DENISE WILLIAMS

20        FOR THE DEFENDANT:    PROPST LAW FIRM, PC
                                P.O. BOX 3717
21                              ABILENE, TEXAS  79604
                                (325) 437-9977
22                              BY:  MR. JEFFREY PROPST

23     OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                  1100 COMMERCE STREET, RM. 1654
24                                DALLAS, TEXAS  75242
                                  (214) 753-2349

25

## <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| CHANCE FERGUSON | |
| Direct By MR. SUCSY ......................................... | 4 |
| Cross By MR. PROPST ......................................... | 32 |
| TAMMI WOODALL | |
| Direct By MS. WILLIAMS ...................................... | 41 |
| Cross By MR. PROPST ......................................... | 52 |
| Redirect By MS. WILLIAMS .................................... | 54 |
| Recross By MR. PROPST ....................................... | 55 |


| **Government Exhibits** | **Page** |
|---|---|
| No. 1 Admitted into Evidence | 15 |
| No. 2, 3 Admitted into Evidence | 17 |
| No. 5 Admitted into Evidence | 18 |
| No. 8 Admitted into Evidence | 24 |
| No. 6, 7 Admitted into Evidence | 25 |
| No. 10 Admitted into Evidence | 31 |
| No. 4 Admitted into Evidence | 38 |


| **Government Rests** | **Page** |
|---|---|
| | 59 |


| **Motion for Judgment** | **Page** |
|---|---|
| | 59 |


| **Defendant Rests** | **Page** |
|---|---|
| | 71 |

```
 1              THE COURT:  Be seated.

 2          Call this case for trial, United States versus Powell.

 3          Mr. Sucsy, the Government is ready?

 4              MR. SUCSY:  The Government is ready.

 5              MR. PROPST:  The Defendant is ready.

 6              THE COURT:  Mr. Propst, you filed earlier this month

 7      the waiver of the jury trial.  Did we discuss this at the

 8      pretrial conference?

 9              MR. PROPST:  Yes.

10              THE COURT:  All right.  So we are ready to go.

11          Mr. Sucsy, if you want to call your first witness.

12              MR. SUCSY:  Your Honor, so I don't forget, we have a

13      stipulation of some evidence that we have here that we would

14      like to present to the Court in writing.

15              THE COURT:  All right.

16              MR. SUCSY:  And if I could, it is fairly short.  I

17      would just like to read it.

18              THE COURT:  Yes, sir.  Go ahead.

19              MR. SUCSY:  "The parties in the above-referenced

20      case hereby agree and stipulate to the following facts, and

21      agree that such facts are hereby established without the need

22      for further support, testimony from witnesses, exhibits,

23      documentary evidence, or any other proof or certification.

24          "Defendant Troy E. Powell did not register as a sex

25      offender or update such a registration in Texas, or any other
```

1    place, with respect to residing in the Northern District of

2    Texas in 2013 or 2014."

3                    THE COURT:  All right.

4                    MR. SUCSY:  And the United States would call Chance

5    Ferguson.

6                    (Whereupon, the oath was administered by the Court.)

7                              CHANCE FERGUSON,

8    Testified on direct examination by Mr. Sucsy as follows:

9    Q.    Could you state your name, please?

10   A.    Chance Ferguson.

11   Q.    And how are you employed?

12   A.    Deputy United States Marshal in the Northern District of

13   Texas, Abilene Division.

14   Q.    And how long have you been in that job?

15   A.    I have been a Deputy United States Marshal for 11 years

16   now, and I have been in Abilene for six.

17   Q.    All right.  You know we are here to try the case of Troy

18   E. Powell.  Have you investigated a criminal case on that

19   individual?

20   A.    Yes, sir, I have.

21   Q.    And can you identify if that person is in the courtroom

22   at this time?

23   A.    Yes, sir.  Defendant Powell is sitting in the orange

24   jumpsuit immediately to the right of his counsel at the

25   Defendant's table.

```
1    Q.   And what was the nature of your investigation of

2    Mr. Powell?

3    A.   He was in violation of the Adam Walsh Act for failure to

4    register as a sex offender.

5    Q.   Is that also in this case indicted as a violation of 18

6    U.S.C. 2250?

7    A.   Yes, sir.  That is the statute.

8    Q.   All right.  Were you able to initially find Mr. Powell or

9    search for him in records?

10   A.   Yes, sir.

11   Q.   All right.  Where did you -- What did you do to initiate

12   your investigation?

13   A.   The first part of my investigation would be to ascertain

14   whether Mr. Powell had registered either in Abilene, Taylor

15   County, or in the state of Texas, and that would trigger

16   whether I proceeded with the investigation or did not proceed

17   with the investigation.

18   Q.   All right.  And I take it you didn't find any indication

19   he had registered in Texas.

20   A.   Correct.  There was no indication that Mr. Powell had

21   registered with any of the local authorities or the state of

22   Texas, and I did find in my search where he had registered in

23   Illinois.

24   Q.   In the state of Illinois?

25   A.   Yes, sir.
```

1   Q.   All right.  Did you -- Where did you start looking for

2   him?  What gave you the impression he might be in Texas

3   without registering?

4   A.   I believe it was during the Thanksgiving break, I was

5   actually on leave, and was contacted by Gary Heslup with the

6   Abilene Police Department Sex Offender Registration Unit that

7   said that they had a call from a school resource officer at

8   Abilene High that an outcry to CPS had been made that a sex

9   offender by the name of Troy Powell was living on Minter Lane

10  and had not registered in the city limits of Abilene.

11  Q.   All right.  And did you subsequently find Mr. Powell?

12  A.   Yes, sir, I did.

13  Q.   All right.  Where did you find him?

14  A.   At the time that I found Mr. Powell, he was living out in

15  the Lemons Gap area.  It is actually a Tuscola residence, but

16  it is south of Abilene, in a house that he had purchased.

17  Q.   And that is in Taylor County the Northern District of

18  Texas?

19  A.   Yes, sir, it is.

20  Q.   And what did you do with him when you found him?

21  A.   At the time that I found him, you know, I asked him if he

22  knew why I was there, and I was there for him failing to

23  register as a sex offender, and at that time he stated that it

24  had been over ten years and that he did not need to register.

25          That kind of -- When we arrested him, it was late in the

```
1    evening and I was very tired, and it kind of made me pause.

2    So I told him that at that time he was not under arrest, but

3    he was being detained, and I made some phone calls just to

4    verify that it indeed was a trigger of the Adam Walsh Act,

5    which I did verify at that point, and we put him in custody.

6    Q.   All right.  Did you after that have occasion to take a

7    written statement from him?

8    A.   Yes, sir, I did.

9    Q.   And I will direct your attention to Government's Exhibit

10   No. 4 and ask if you can identify what that is.

11   A.   Yes, sir.  It is the interview that I conducted with

12   Mr. Powell.

13   Q.   All right.  And that is a fairly short statement.  What

14   does it have, five different questions you asked him?

15   A.   Yes, sir.

16   Q.   And where did that occur?

17   A.   That occurred in my office when we brought him in for

18   processing.

19   Q.   All right.  And did you advise him of his *Miranda*

20   warnings and his rights before asking him these questions and

21   having him sign it?

22   A.   Yes, sir, I did.

23   Q.   All right.  And he agreed to answer the questions?

24   A.   Yes, sir.

25   Q.   All right.  Let's go over the --
```

```
 1              MR. SUCSY:  The Government would offer Government's

 2    Exhibit No. 4 at this time.

 3              THE COURT:  Counsel?

 4              MR. PROPST:  Your Honor, if I may be permitted to

 5    question the witness about the voluntariness of his statement

 6    prior to it being admitted.

 7              THE COURT:  I will conditionally admit it subject to

 8    your cross examination of the witness.

 9              MR. PROPST:  Thank you.

10    Q.  (BY MR. SUCSY)  All right.  There are five questions that

11    you asked him.

12    A.  Yes, sir.

13    Q.  Let's go over those.  The first one deals with when he --

14    You asked him when he arrived in Texas.  And what did he tell

15    you?

16    A.  He said that it was roughly the first or second week of

17    November, and while I was writing it he said it was the second

18    week of -- I am sorry.  Of December.  And so I had marked out

19    first and put second week of December.

20    Q.  All right.  So he told you it was the second week of

21    December?

22    A.  Yes, sir.

23    Q.  And did you talk to some other people in the course of

24    your investigation?

25    A.  Yes, sir.
```

1   Q.   And was that consistent with what you learned from other

2   people?

3   A.   Most of the witnesses that I talked to thought that it

4   was actually the end of November when he got there, and that

5   is one reason I asked this question--to try to establish

6   exactly when it was.

7   Q.   All right.  And the second question covers whether

8   Mr. Powell resided -- or where he resided after arriving in

9   Texas.  And what did he tell you about that?

10  A.   He said that he lived in his truck, that he lived in a

11  hotel, he lived at 2642 Minter Lane he lived at Nick's house

12  in Clyde, and then moved to 326 County Road 606 in Tuscola.

13  Q.   All right.  What is that -- Can you describe the place he

14  said he moved in Tuscola?

15  A.   It was actually an old church at one time, and he was

16  renovating it into a house.

17  Q.   Okay.  And he told you he had moved there, and is that

18  the same place where you testified that you found him when you

19  went to look for him?

20  A.   Yes, sir.

21  Q.   And is that -- It is not in the city limits of Abilene?

22  A.   Correct.  It is in the county.

23  Q.   And is it remote, or how would you describe the area?

24  A.   I would describe it as rural.  There are some neighbors

25  out there that -- but it was on a little bit of acreage.

 1   Q.   All right.  And the third question covers whether

 2   Mr. Powell had obtained or was employed in Texas or in this

 3   area.  What did he tell you?

 4   A.   He said no, that he was not employed at the time, but he

 5   had planned to work at USG, United States Gypsum plant in

 6   Sweetwater, Texas, and if he was released that he would go to

 7   work there.

 8   Q.   All right.  So he did indicate that he was planning on

 9   working here in this area?

10   A.   Yes, sir.

11   Q.   And what does that tell you about his intent to stay or

12   reside in this area?

13   A.   I took that to mean that he was going to live here,

14   because it would have been a far drive from Illinois to

15   Sweetwater, Texas.

16        MR. PROPST:  I will object to speculation.

17        THE COURT:  Overruled.

18   Q.   (BY MR. SUCSY)  The fourth question was whether he was

19   aware of his duty to register in Texas.  What was his answer

20   to that?

21   A.   He answered no.

22   Q.   And then the last one was -- Well, let's say -- Were you

23   aware that one or more documents had been given to him from

24   the state of Illinois telling him that if he moved to another

25   state that he should check with local law enforcement to see

1  if he had a duty to register?

2  A.   Yes, sir.

3  Q.   And as a result, did you ask him in that fifth question

4  what he had done to determine his duty to register when he

5  came here?

6  A.   Yes, sir.  That is correct.  On multiple documents it

7  advises him if he moves to another state it is his

8  responsibility to check with local law enforcement as to his

9  duty to register, and when I asked him if he had contacted

10  local law enforcement upon entering the state of Texas, he

11  replied no, that he went online and researched it himself, and

12  was under the impression he did not have to register.

13  Q.   All right.  So he said he did his own research on that,

14  even though he had been advised to, instead, check with local

15  law enforcement.

16  A.   Correct.

17  Q.   In your first conversation with him, did Mr. Powell --

18  did he make a spontaneous statement to you about -- I think

19  you have already gone into it a little bit.  When you told him

20  what you were detaining him for, what was his explanation as

21  to why he said that he wasn't -- shouldn't be detained or

22  arrested?

23  A.   It was the same as that last question--that he no longer

24  had to register in the state of Illinois because it was just a

25  ten-year duty to register in the state of Illinois so he no

1   longer had to, so he got online when he came to Texas and

2   researched it and found that he did not have to.

3   Q.   Did he deny being convicted of a sex offense at any time

4   to you?

5   A.   No, sir, he never made that statement.

6   Q.   All right.  I will now direct your attention to

7   Government Exhibit No. 1, 2, and 3, and I will ask if you can

8   identify what they are.

9   A.   Yes, sir.  Government Exhibit No. 1 is the plea for

10   Fremont County through the state of Colorado.

11   Q.   Is that entitled an information?

12   A.   Yes, sir, on the top right corner it is.

13   Q.   The upper right hand corner?

14   A.   Yes, sir.

15   Q.   All right.  What is Government Exhibit No. 2?

16   A.   I am sorry.  Government Exhibit No. 2 is actually the

17   plea agreement.

18   Q.   No. 1 is an information.  Government Exhibit No. 2,

19   towards the left top it is entitled plea agreement.  Is that

20   correct?

21   A.   Yes, sir.  And Exhibit No. 3 would be the judgment and

22   commitment on the case.

23   Q.   All right.  And that is -- The title of it is actually

24   judgment of conviction, sentence, and order to sheriff?

25   A.   Correct.

```
 1   Q.   And as to these documents, what -- Is there a Defendant's
 2   name on each of these documents?
 3   A.   Yes, sir.  In Exhibit No. 1, this says, "The People of
 4   the State of Colorado versus Troy Powell."  Exhibit No. 2,
 5   "The People of the State of Colorado versus Troy Powell."  And
 6   No. 3 says, "The people of the State of Colorado versus Troy
 7   Eugene Powell, Defendant."
 8   Q.   All right.  And what is the name of the county and state
 9   that these papers relate to and the cause number?
10   A.   It is District Court of Fremont County, Colorado, Cause
11   No. 92-CR-137, Division 2.
12   Q.   And that is true of all three of these documents,
13   consistent --
14   A.   Yes, sir, it is.
15   Q.   Location and cause number?
16   A.   That is correct.
17   Q.   And in the information, Government Exhibit No. 1, what
18   statute is the statute charged in the information?
19   A.   The statute is CRS 18-3-405, sexual assault on a child,
20   class IV felony.
21   Q.   And what is the date on that document?
22   A.   The date on this document would be the 30th of June,
23   1992.
24   Q.   All right.  And does the document purport to bear a
25   signature of a judge on the second page?
```

1    A.    On Exhibit No. 1, sir?

2    Q.    Yes.  Can you see page 2 of Exhibit No. 1?

3    A.    I do not see page 2.

4    Q.    There is no page 2 on that?

5    A.    No, sir.

6    Q.    Did you slip it out of the plastic folder?

7    A.    Oh, it is on the back.  I thought it was attached.  Yes,

8    sir, there is page 2, and it is signed by Judge Julie

9    Marshall.

10   Q.    All right.  And this document, does it bear a fax header

11   with information as to where the fax came from?

12   A.    Yes, sir.  It says March 29th, 2013, 13:48 hours from

13   Fremont County Courts.  Fax number is 719-269-0134.

14   Q.    All right.  And how did that come into your possession?

15   Did you make a request for it?

16   A.    Yes, sir.  I think this was actually faxed over to --

17   according to the fax number it got sent to, it looks like it

18   is probably to Gary Heslup with APD probably provided me this

19   with his original stuff.

20   Q.    And, again, he is a sex offender registration coordinator

21   for the City of Abilene?

22   A.    Yes, sir.  That is correct.

23          MR. SUCSY:  All right.  The Government would offer

24   Government's Exhibit No. 1 at this time.

25          MR. PROPST:  Your Honor, I object.  Rule 902 of the

1    Federal Rules of Evidence specifies a very clear way that a

2    court record can be entered or it can be authenticated, which

3    is by certification under seal by someone authorized to do so.

4    That has not been done in this case.  We object on those

5    grounds.

6              THE COURT:  Okay.  Objection is overruled.

7    Government's Exhibit No. 1 is admitted.

8    Q.   (BY MR. SUCSY)  All right.  I will direct your attention

9    to Government's Exhibits 2 and 3 and ask if you can identify

10   what they are.

11   A.   Yes, sir.  Exhibit No. 2 is the plea agreement from The

12   People of the State of Colorado versus Troy Powell, Defendant.

13   Exhibit No. 3 is The People of the State of Colorado versus

14   Troy Eugene Powell, Defendant.  It is the judgment,

15   conviction, and sentence order to the sheriff.

16   Q.   All right.  And I think we have already gone over this,

17   but the state, the county, and the cause number, and the

18   Defendant's name on each of those are the same --

19   A.   That is correct.

20   Q.   -- between No. 2 and 3 and as well Exhibit No. 1?

21   A.   Yes, sir.

22   Q.   And on Exhibit No. 3, if you could look at that, do you

23   see this judge's name again?

24   A.   Yes, sir.  It is Judge Julie G. Marshall.

25   Q.   And does that appear to be the same name and signature

1    that appears on Government Exhibit No. 1?

2    A.    Yes, sir, it does.

3    Q.    And as to Exhibits G-2 and G-3, do they bear a

4    certification that they are accurate copies of the official

5    records of Fremont County, Colorado?

6    A.    Yes, sir.  They both have the seal on them.

7    Q.    And what is the date of the plea agreement?  That is

8    Exhibit No. 2.

9    A.    The date of the plea agreement was the 25th of September,

10   1992.

11   Q.    And the date of the judgment and sentence?  And I believe

12   there are two pages there, so you might want to pull that out

13   of the sleeve.  They are going to be two different dates.  The

14   first page is what date?

15   A.    The first page is 11/6 of 1992.

16   Q.    All right.  And does that page appear to bear that

17   signature of Judge Julie Marshall?

18   A.    Yes, sir, it does.

19   Q.    And the second page is dated what?

20   A.    It is 6/20 of 1997, and it is signed by the same judge as

21   well.

22   Q.    All right.  Now, these documents appear to be fairly

23   similar, but Exhibit No. 3, does that show that the Defendant

24   originally received a probated sentence in his conviction?

25   A.    Yes, sir.  He had a probation period for eight years with

1  a term of jail time for 60 days to commence on January 4th,

2  1993.

3  Q.   All right.  And that was for sexual assault of a child of

4  18-3-405 under Colorado statute?

5  A.   Yes, sir.  Class IV felony.

6  Q.   And then on June 20th of 1997, does it appear that he was

7  remanded to custody of the Department of Corrections for a

8  term of eight years?

9  A.   Yes, sir.

10  Q.   And that is under the same cause number?

11  A.   Correct.

12  Q.   And again, that bears Julie Marshall's signature as the

13  judge?

14  A.   Yes, sir.

15        MR. SUCSY:  The Government offers Government Exhibit

16  No. 2 and 3.

17        MR. PROPST:  No objection to No. 2 and 3.

18        THE COURT:  Those are admitted.

19  Q.   (BY MR. SUCSY)  Now, going back to the plea agreement,

20  Government Exhibit No. 2.

21  A.   Yes, sir.

22  Q.   Does that bear a signature of the Defendant?

23  A.   Yes, sir, it does.

24  Q.   And under what name?

25  A.   Troy Powell.

1    Q.    And that is the document that is dated September 25th of

2    1992?

3    A.    Yes, sir.  That is correct.

4    Q.    I will direct your attention now to Government Exhibit

5    No. 5 and ask if you can identify what that is.

6    A.    Yes, sir.  It is paperwork and information that I

7    received from the Taylor County Clerk's Office.

8    Q.    All right.  And the second page in particular, what is

9    the title of this document?

10   A.    This is a special warranty deed on the property that

11   Mr. Powell had purchased in Tuscola, Texas.

12           MR. SUCSY:  The Government offers Government Exhibit

13   No. 5.

14           MR. PROPST:  No objection to No. 5.

15           THE COURT:  Admitted.

16   Q.    (BY MR. SUCSY)  And who was the grantee, the person who

17   was receiving ownership under this document?

18   A.    Troy Powell.

19   Q.    And what is Mr. Powell's address listed on this document?

20   A.    326 County Road 606, Tuscola, Texas, 79562.

21   Q.    All right.  And the date of the document?

22   A.    December 26, 2013.

23   Q.    All right.  And you have already described this property.

24   Is this the one that you said that he had bought and was

25   remodeling?

1    A.    Yes, sir.

2    Q.    Now, in the course of your investigation, did you get on

3    the internet to see if you could find Mr. Powell?

4    A.    Yes, sir, I did.

5    Q.    All right.  And did you find a person using the name Troy

6    Powell with circumstances that were consistent with the Troy

7    Powell that you were dealing with in Taylor County, Texas?

8    A.    Yes, sir, I did.

9    Q.    All right.  I will direct you to Government Exhibit No. 8

10   at this time and ask if you can identify what that is.  Just

11   leave that one out and we will get to it later.  You may need

12   to slip those out.  Government Exhibit No. 8 I believe is

13   several pages.

14   A.    Okay.

15   Q.    And while you are doing that, I will ask you this

16   question.  The ones you are holding there, it is a copy that

17   is -- you printed off, and it is rather faint, but as a result

18   the copies of the original you are holding are somewhat

19   illegible.

20   A.    Correct.

21   Q.    Is that correct?

22   A.    Yes, sir.

23   Q.    So the one the Judge would have and the one Mr. Propst

24   had and the one that I had to keep, they just couldn't quite

25   maintain all of the data that is on the one that you are

1    holding there.  Is that correct?

2    A.   Yes, sir.  They are screenshots I took off my computer

3    and printed, and I think my printer was low on ink or

4    something.

5    Q.   All right.  And Mr. Propst was given an opportunity

6    before the hearing, because he expressed difficulty in

7    reading, but he has had an opportunity to look at the one you

8    are looking at there.

9         Okay.  Now, my question had been, when you found this

10   individual that was using the name Troy Powell online -- And

11   is this through a particular application online?

12   A.   I got this off of Facebook.

13   Q.   Okay.  And that is a social networking and people can get

14   online and post comments about things that are happening in

15   their lives and whatnot?

16   A.   Yes, sir.

17   Q.   All right.  And this was under a name that you found a

18   person using the name Troy Powell?

19   A.   Yes, sir.  When I originally had researched Facebook to

20   see if I could find Troy Powell's Facebook account, I think

21   four or five Troy Powells popped up, so I went back and popped

22   in Troy Powell's email address that we had off the

23   registration documents from Illinois, which was

24   troypowell10000@yahoo.com.  When I did that only one popped

25   up.  And when I researched that particular Facebook account, I

1    could see that it was the same person that I was

2    investigating.

3    Q.   All right.  So you obtained these records by using this

4    Defendant's email account as reflected on his Illinois

5    paperwork?

6    A.   Yes, sir.

7    Q.   And we will be getting to that shortly.  Does the

8    document purport to reflect dates when various posts or

9    comments were made?

10   A.   Yes, sir, it does.

11   Q.   Did any of the posts from Mr. Powell include photographs?

12   A.   Yes.  There were several.

13   Q.   And what is depicted in these photographs?

14   A.   Most of them are views from outside of the residence at

15   Tuscola where I arrested Mr. Powell.

16   Q.   All right.  Now, you were there.

17   A.   Correct.

18   Q.   Are the views that are shown in Exhibit No. 8 consistent

19   with that being Mr. Powell's residence?

20   A.   Yes, sir.  And there was also one from the inside of the

21   house that showed a cabinet that was there in the kitchen area

22   where we were in the house.

23   Q.   And were there any comments posted by the person who was

24   posting these photographs --

25   A.   Yes, sir.

```
1    Q.    -- about what was being shown there?

2    A.    Yes, sir.

3    Q.    All right.  And do any of these -- If you could specify

4    which page, but do any of these show a photograph and then a

5    comment from a person under the name of Troy Powell stating

6    what is being depicted?

7    A.    Yes, sir.  On page 2, the general photograph that looks

8    like this, it says that on January 9th Troy Powell posted one

9    of the views from my house.  On page 3, that will show a loaf

10   of bread on a cabinet.  That is actually the cabinet that is

11   inside the kitchen area of Troy Powell's house.  Page 4 will

12   show the wind turbines and the dark picture.

13   Q.    All right.  And when you were out there, if you looked a

14   certain direction would you see wind turbines such as those

15   depicted on that page?

16   A.    Yes, sir.  If my memory serves me correct from being in

17   that area, I think that is the Horse Hollow Wind Turbine

18   Division.

19   Q.    Okay.

20   A.    I believe page 5 is going to be the one that is clear, a

21   little bit clearer, and it was posted and shows an outlook

22   from that property as well.

23         And then page 6 is a post that appears like that that

24   says, "After 15 years I figured out what I am allergic to.

25   Juniper.  Guess what type of forest I live in?"  Which the
```

1    property is surrounded by cedar trees and junipers.  That was

2    posted by Troy Powell on January 3rd.

3    Q.   January 3rd of 2014?

4    A.   Yes, sir.  It doesn't have the year on there, but that is

5    the way that Facebook operates.  If it is in the current year,

6    it doesn't put the year.  If it had been 2013 or 2009, it

7    would have stated that year.

8    Q.   All right.

9            MR. SUCSY:  The Government offers Government Exhibit

10   No. 8.

11           MR. PROPST:  Your Honor, we object on the grounds of

12   authentication, once again.  It is a Facebook account, social

13   media site.  Simply finding a site that is entitled Troy

14   Powell and shows photographs from Abilene is not sufficient to

15   authenticate that Mr. Powell actually made any statement in

16   here.  That is what it is being offered for.  My understanding

17   is the statements of the Defendant -- Anybody can log into a

18   Facebook account if they have a password.  It can be done from

19   anywhere in the world, and insofar as that we object on

20   grounds of authentication.

21           THE COURT:  I will overrule the objection.  I think

22   the information testified to by Deputy Marshal Chance

23   sufficiently authenticates the document.  The objections go to

24   the weight in terms of who may or may not have made the

25   statements.  But he has given sufficient information, the

1    email account, the name, et cetera, that sufficiently

2    authenticates the exhibit.

3         Government's Exhibit No. 8 is admitted.

4    Q.   (BY MR. SUCSY)  All right.  I will direct your attention

5    now to Government's Exhibit No. 6 and 7.  And we were talking

6    about an Illinois document that had that

7    troypowell10000@yahoo.com email address.  Is this an Illinois

8    sex offender registration form?

9    A.   Yes, it is.

10   Q.   And what is Exhibit No. 7?

11   A.   Exhibit No. 7 is the letter that the State of Illinois

12   mailed to the Defendant that is a notice of expiration of

13   Illinois sex offender registration requirements that advises

14   him under Illinois state law he no longer has a duty to

15   register in that state.

16   Q.   All right.  Are both of these documents certified as

17   authentic records from the State of Illinois?

18   A.   Yes, sir.  Exhibit No. 7 is certified as well as Exhibit

19   No. 6.

20   Q.   All right.  And Exhibit No. 7, that is the letter.  It is

21   actually the second -- It is on the second page where it is

22   certified and the letter was sent out?

23   A.   Correct.

24             MR. SUCSY:  The Government offers 6 and 7.

25             MR. PROPST:  No objection to 6 and 7.

 1          THE COURT:  Admitted.

 2    Q.  (BY MR. SUCSY)  Now, what is the -- Looking at Government

 3    Exhibit No. 6, what is the date of that particular

 4    registration form?  It would appear on the bottom right corner

 5    I believe of the front page.

 6    A.   Yes, sir.  It is April 3rd of 2013.

 7    Q.   All right.  And this -- Just for clarification, I think

 8    it has been copied on some occasions as a two-page document,

 9    but the original was a one-page with print on both sides.  Is

10    that correct?

11    A.   Yes, sir.  That is correct.

12    Q.   So the -- And that is is as it appears in the original

13    exhibit before you?

14    A.   Yes, sir.

15    Q.   Does it purport to bear the signature of the person

16    registering on both the front and back?

17    A.   Of the individual who is doing the registration or of the

18    sex offender who is registering?

19    Q.   The sex offender who is registering.

20    A.   Yes, sir, it does.

21    Q.   And what is the full name and the date of birth of the

22    person shown to be registering at this time?

23    A.   It just gives Troy E. Powell, date of birth 10/27 of

24    1967.

25    Q.   And is that -- In connection with booking Mr. Powell, did

1    you obtain identifiers?

2    A.   Yes, sir.

3    Q.   And when I am referring to Mr. Powell, I am saying the

4    one who is sitting in the courtroom here?

5    A.   Yes, sir.  That is correct.  When we booked Mr. Powell he

6    gave us the exact same information as well as social security

7    number.

8    Q.   Okay.  Any other -- There are several, what I would call

9    identifiers here on this document.  There is a social security

10   number, there is a date of birth, there is an FBI number.

11   Were those all consistent with the person you were handling

12   yourself?

13   A.   Yes, sir.  And the FBI number is one of the most valuable

14   numbers that we look for to make sure that we are dealing with

15   the same person since it is linked to fingerprints.

16   Q.   All right.  And is there a portion of the form right

17   about the middle where it references a date of conviction?

18   A.   Yes, sir.  The date of conviction was 9/25 of 1992 in

19   Fremont County, Colorado.

20   Q.   All right.  And is that the exact same date that appears

21   on his plea agreement, Exhibit No. 2 in this case?

22   A.   Yes, sir, it is.

23   Q.   And the county of conviction is shown as what?

24   A.   Fremont.

25   Q.   Fremont.  And then the state?

1    A.    Is Colorado.

2    Q.    And is that the place that is referenced in Exhibits 1,

3    2, and 3?

4    A.    Yes, it is.

5    Q.    And what is the offense that this individual is

6    registering for here?

7    A.    Aggravated criminal sexual abuse, 13 to 16, which would

8    be the age of the defendant.

9    Q.    Not the age of the defendant.

10   A.    I am sorry.  The age of the victim.

11   Q.    Okay.  Now, looking three lines further down, does it

12   show the age of the victim in particular in this case?

13   A.    Yes, sir.  The age of the victim was 14 years.

14   Q.    All right.  And right next to that does it show the age

15   of the offender at the time of that offense?

16   A.    Yes, sir.  The age of the offender at the time of offense

17   was 24 years old.

18   Q.    And a couple of lines up from 24, does it show his

19   sentence in that case?

20   A.    Yes, sir.  It says that he received a sentence of eight

21   years probation/prison.

22   Q.    All right.  And, in fact, as reflected in Exhibit 1, 2,

23   and 3, that Troy Powell, in fact, received an eight-year

24   probated sentence and then ultimately prison?

25   A.    Well, the original conviction was the eight-year probated

1    sentence, and then it was a violation of his probation and he

2    was sent to prison.

3    Q.   All right.  On the back of this document, and I am still

4    referring to Government Exhibit No. 6, is there a reference to

5    the Adam Walsh Act, Title 18 U.S.C. 2250?

6    A.   Yes, sir.  About three quarters of the way down in the

7    box.

8    Q.   All right.  Could you read that short portion?

9    A.   Yes, sir.  It says, "Under the Adam Walsh Child

10   Protection and Safety Act of 2006, 18 United States Code

11   subsection 2250, if you travel to another state and fail to

12   register as required, you are also subject to federal

13   prosecution that carries penalties of a fine and/or

14   imprisonment up to ten years."

15   Q.   All right.  Now, directing your attention to what we have

16   referred to as the letter in evidence as Government Exhibit

17   No. 7, I believe you refer to it as a letter notifying him

18   that he did not need to register any longer under the laws of

19   the State of Illinois?

20   A.   Yes, sir.  That is correct.

21   Q.   And what is the date of that letter?

22   A.   May 24th of 2013.

23   Q.   All right.  Even though the letter informs Mr. Powell

24   that he wasn't required to register anymore under Illinois

25   law, does the letter warn him that he still may be required to

1    register as a sex offender if he moves to another state?

2    A.   Yes, sir.  In the second sentence of the page in the

3    first paragraph, the first paragraph says, "You are no longer

4    required to register under the Illinois Sex Offender

5    Registration Act," and has the title.  And it says, "If you

6    move to another state, it is your responsibility to contact

7    law enforcement authorities in that state to verify you are

8    not required to register there.  Sex offender registration

9    laws vary from state to state."

10   Q.   All right.  And you specifically covered that with him

11   when you asked him if he had done that--checked with law

12   enforcement --

13   A.   Yes, sir.

14   Q.   -- in Texas?

15   A.   Yes, sir.  That was the main reason I asked him, to see

16   if some law enforcement agency had advised him that he did not

17   have a duty to register.

18   Q.   All right.  And his answer was that he had not done that?

19   A.   That he had not done that; he had researched it himself

20   online.

21   Q.   Now, directing your attention to Government's Exhibit

22   No. 10, do you recognize or can you identify what these are?

23           MR. SUCSY:  And these are additions to the original

24   exhibit list, Your Honor, and they are not on the original

25   list.

1              THE COURT:  Okay.

2              THE WITNESS:  Yes, sir.  These are all registration

3     documents from the State of Illinois dating all the way back

4     from 2003 all the way up to 2012.

5     Q.    (BY MR. SUCSY)  All right.  So during that time he was

6     registering on an annual basis in Illinois?

7     A.    Yes, sir.  It appears so.

8     Q.    And are these -- I guess you could summarize them by

9     saying they are similar to Government Exhibit No. 7?

10    A.    Correct.

11    Q.    Government Exhibit No. 7 was the last one that he did?

12    A.    Correct.  They had originally sent me just the one from

13    2013, and then I requested them to have every single one of

14    them that he had ever signed, because that is important to my

15    investigation is to have that in my files that he was notified

16    of his duties.

17    Q.    But these -- The similarities would be things such as the

18    name of the individual, and the offense of conviction being

19    aggravated criminal sexual abuse in Fremont, Colorado, the age

20    of the victim being 14, the age of the offender at the time of

21    the offense being 24, all of those kinds of things just repeat

22    every year that he registered.  Is that correct?

23    A.    Yes, sir.  All of the information as far as that goes is

24    identical, including the FBI number.

25    Q.    And are these certified records similar to Government's

1    Exhibit No. 6?

2    A.    Yes, sir.  They have all been certified as originals.

3    Q.    And do these each of these appear to be signed by a

4    person, the registrant person registering as a sex offender,

5    Troy Powell?

6    A.    Yes, sir, they do.

7    Q.    So we have multiple copies of his signature?

8    A.    Yes, sir.

9    Q.    And does his signature change a little bit, but basically

10   is it similar over the years?

11   A.    Yes, sir.  They appear to be a little sloppier around

12   2003 and then more progressed.  You can distinguish the Powell

13   a little bit more definite as the years went by.

14        MR. SUCSY:  All right.  The Government offers

15   Exhibit No. 10.

16        MR. PROPST:  No objection to No. 10.

17        THE COURT:  Government's No. 10 is admitted.

18   Q.    (BY MR. SUCSY)  All right.  Now, going back to the

19   Defendant's residence in Tuscola that he had bought on

20   December 26th.

21   A.    Yes, sir.

22   Q.    I am just going to ask you some questions about it.

23        Your observation when you were there, did it appear

24   consistent with him living there or residing there?

25   A.    Yes, sir.  He had his clothes there, a mattress that he

1    was sleeping there, water was running, electricity.

2    Q.    So he had utilities?

3    A.    Yes, sir.

4    Q.    Any pets there?

5    A.    Yes, sir.  He had I believe it was two dogs when we were

6    there.

7    Q.    Okay.

8              MR. SUCSY:  I pass the witness.

9              THE COURT:  Mr. Propst?

10                    CROSS EXAMINATION

11   By Mr. Propst:

12   Q.    Marshal Ferguson, how are you?

13   A.    Good.  How are you, sir?

14   Q.    I am fine, thank you.

15         The documents that you have gone through in Government's

16   Exhibit No. 7, Government's Exhibit No. 10 show that

17   Mr. Powell had registered in the state of Illinois for some

18   10, 11 years?

19   A.    Yes, sir.

20   Q.    And that Exhibit No. 7 -- Excuse me.  Exhibit No. 6 and

21   10 show that?

22   A.    I am sorry.  Could you ask me that again?

23   Q.    Exhibit No. 6 and 10 had shown that he had registered in

24   Illinois for approximately ten years?

25   A.    Yes, sir.

1    Q.   And Exhibit No. 7 showed that that duty had expired, as

2    far as the State of Illinois was concerned, in 2013?

3    A.   That is correct.

4    Q.   Okay.  And the offense that had caused Mr. Powell to

5    register was from Colorado in 1992?

6    A.   That is correct.

7    Q.   Okay.  That he was -- You said that the victim was 14

8    years old?

9    A.   I believe that is what -- Yes, that is what the

10   registration and the JNCs state.

11   Q.   And Mr. Powell was 24?

12   A.   And he was 24, yes, sir.

13   Q.   Mr. Heslup of the Abilene Police Department had contacted

14   you you said the end of November or Thanksgiving break?

15   A.   I think it was sometime around there.  I believe it was

16   Thanksgiving, and I told him that I was off, but as soon as I

17   got back I would look into it.

18   Q.   Okay.  And when did you come back to work after that?

19   A.   I don't recall.  I was probably off three or four days,

20   so I would say the first of December probably sometime.

21   Q.   Okay.  Somewhere around the first of December.

22        The date that you arrested Mr. Powell, do you remember

23   what day that was?

24   A.   That was February 5th of 2014.

25   Q.   Okay.  So about two months -- a little bit over two

1    months after Mr. Heslup had contacted you.

2    A.    Correct.

3    Q.    During that time from the end of December -- excuse me.

4    The beginning of December until the beginning of February,

5    were you personally observing Mr. Powell?

6    A.    No.    The date that I arrested him was the first time that

7    I had any contact with Mr. Powell.

8    Q.    Okay.    Had you been watching his house?

9    A.    No.

10   Q.    Had you been looking for vehicles that he drives?

11   A.    No, sir.

12   Q.    Okay.    Had you been doing anything to verify with your

13   own eyes that he was here living in Taylor County, Texas?

14   A.    As far as observing him or interviews or --

15   Q.    Just with your own eyes, personal observation.

16   A.    No, sir.

17   Q.    Okay.    Were you in contact with family members?

18   A.    Yes, sir, I was.

19   Q.    Okay.    And is it the same family members who -- Are they

20   the same people that made the initial report to Mr. Heslup?

21   A.    I don't believe so, sir.    I think the report from

22   Mr. Heslup actually was generated through a call from CPS and

23   the school resource officer.

24   Q.    Okay.    But you don't know who originated -- If CPS got

25   involved, you don't know who originated the complaint with

```
 1   CPS.
 2   A.    I believe that it was the school counselor and the school
 3   resource officer at Abilene High.
 4   Q.    Okay.  And that would have been after they had spoken to
 5   Mr. Powell's daughter?
 6   A.    Yes.
 7   Q.    Okay.  And his daughter lives with her grandmother and
 8   her aunt.  Is that right?
 9   A.    To my understanding, yes.  That is correct.
10   Q.    All right.  Whenever you went to the house in -- it was
11   February 5th when you went and arrested Mr. Powell in the
12   Lemons Gap area?
13   A.    Yes, sir.
14   Q.    The house itself had sparse furnishings, didn't it?
15   A.    Correct.  It was being remodeled.
16   Q.    Okay.  And are you aware that Mr. Powell remodels houses
17   for -- as a means of living?
18   A.    Not necessarily.  I mean, I knew that he did some
19   handyman work and had some rental properties.
20   Q.    Okay.  I would like to talk about the statement which has
21   been conditionally admitted as Government's Exhibit No. 4.
22   A.    Yes, sir.
23   Q.    It is typical in a case whenever you interview someone
24   who is in custody that you have a *Miranda* form or a form that
25   has the *Miranda* rights on them that the Defendant would
```

1    initial off on.  Isn't that right?

2    A.    It is not in our policy that we have to have a *Miranda*

3    signed.  I read his *Miranda* rights to him from a card,

4    witnessed by FBI Agent Michael Edmonston.  Our policy doesn't

5    dictate they have to sign a form.  I think at the time I

6    looked for it and I didn't have a form in my folder, so I just

7    did it in the presence of a witness.

8    Q.    And who was the witness?

9    A.    It was FBI agent Michael Edmonston.

10   Q.    Okay.  But it is the usual thing you do is have a form.

11   A.    If I have one.  If I have one available, then I will have

12   them sign one.

13   Q.    Okay.  And did you advise Mr. Powell that he had the

14   right to an attorney?

15   A.    Yes, sir.  I read it directly off of the *Miranda* card

16   that I carry in my wallet.

17   Q.    Okay.  But he did not have an attorney present.  Right?

18   A.    Correct.  He did not.

19   Q.    And did -- How did he communicate to you that he wanted

20   to waive his *Miranda* rights and speak with you without an

21   attorney?

22   A.    After I read him the rights, I asked him if he understood

23   his rights, which even says it on the bottom of this card.  I

24   mean, I have got the card if you would like for me to read it.

25   But I asked him if he would like to talk to me.  We kind of

1    bantered back and forth, and he said, well, we will wait.  And

2    then he said, well.  And I said, you don't have to answer any

3    of my questions if you don't want to, or you can answer

4    questions and at any time you can stop.  That is completely up

5    to you.  And at that time he said, well, you can ask me.  And

6    I started asking the questions, and that was pretty much it.

7    Q.   And were you in your office here whenever that happened?

8    A.   Yes, sir, I was.

9    Q.   And was it just you and the FBI agent present along with

10   Mr. Powell or was there anyone else?

11   A.   No, it was just myself and Mr. Powell and the FBI agent.

12   Q.   Okay.  Was he in handcuffs at the time?

13   A.   I don't recall.  We had brought him up to my office for

14   processing, so I don't recall.

15   Q.   And about how long after you had arrested him out in the

16   Lemons Gap area was it that you were questioning him in your

17   office here?

18   A.   Well, the interview says I conducted on the 7th and he

19   was arrested on the 5th, so it would be two days.

20   Q.   Had he been arraigned at that time?

21   A.   He had not been arraigned.

22           MR. PROPST:  Your Honor, we would ask for a finding

23   from the Court that the statement -- It has not been shown by

24   the Government that the statement was given voluntarily due to

25   the absence of a written waiver by the client, by the

 1    Defendant, the fact that he had no attorney present, and the

 2    fact that he had not been arraigned and it was two days after

 3    the arrest.

 4              THE COURT:  All right.  I will overrule those

 5    objections and find that the statement, based on Deputy

 6    Marshal Ferguson's testimony, was voluntarily made.

 7              Government's Exhibit No. 4 is admitted, then.

 8    Q.   (BY MR. PROPST)  There was this period of time we just

 9    talked about from the beginning of December to the beginning

10    of February when he got arrested and you weren't actually

11    watching him in the sense of doing surveillance, but you were

12    communicating with people who I suppose were telling you that

13    they had an eye on him and could kind of give you a location?

14    A.   Yes, sir.

15    Q.   And that went on for about two months?

16    A.   Off or on.  Right now I am in an office by myself

17    covering 13 counties, so it wasn't like I was conducting this

18    investigation every single day for those two months.  You

19    know, I may have went a week or two weeks and then got a day

20    that I could actually go out and do something.  So I couldn't

21    tell you exactly how much it was in that time.  But correct,

22    for about two months the investigation was continuing.

23    Q.   Okay.  And at no -- By the time -- By early December, you

24    had already come to the conclusion that Mr. Powell was

25    required to register in Texas.  Right?

1   A.   I don't think that it was that early.  It was probably

2   -- Before I got all of my information that he did definitely

3   have a duty to register, it was probably in January sometime,

4   maybe even close to February.

5   Q.   Okay.  Whenever -- Did you talk directly with his

6   daughter Rebecca?

7   A.   Yes, I did.

8   Q.   Did you tell her not to tell Mr. Powell that he had a

9   duty to register in Texas and needed to register?

10   A.   No, I don't believe I said that.  I think I told her that

11   it would be better if she did not say anything about talking

12   to me so that if he had a duty to register he would not flee.

13   Q.   Okay.  And one of the things that you could have done,

14   you would agree with me, is you could have notified Mr. Powell

15   or just made contact with him and said, hey, are you planning

16   on registering here or not, because if you stay here very much

17   longer then you are going to be in trouble?

18   A.   Could have.  That is not general policy.  The

19   investigation goes on until you find out if they violated the

20   law or not.  So, I mean, no, I did not do that.  I didn't see

21   a need for that.

22   Q.   Did the -- Did his daughter Rebecca, did she indicate to

23   you that he was under the impression that he didn't need to

24   register here?

25   A.   No, sir.  Actually she gave me the opposite indication.

1    She told me that it was her impression that he knew he was

2    supposed to register --

3              MR. PROPST:  I object to hearsay.

4              THE COURT:  You asked the question.  Go ahead.

5              THE WITNESS:  She gave me the impression that he

6    knew he was supposed to register and didn't because a

7    statement she made to me was she had been in a car wreck and

8    she said, and I will quote, dad didn't even want to stay

9    around because he was scared the police were there and he was

10   going to be arrested for not registering, is the statement she

11   made to me.

12   Q.   (BY MR. PROPST)  Government's Exhibit No. 5 is the deed

13   on the house out in Lemons Gap.

14   A.   Yes, sir.

15   Q.   It has a date on it of December 26th, I believe?

16   A.   Yes, sir.

17   Q.   But that is merely the date that the property is

18   transferred in the legal sense, the title is transferred.

19   A.   As far as I know.  I don't deal with warranties, so I

20   would say it was the date it was filed that it was bought.

21   Q.   The date it was filed.  It doesn't necessarily reflect a

22   date that Mr. Powell, or anybody else, took physical

23   possession of the house.  Right?

24   A.   No, sir.

25             MR. PROPST:  I will pass the witness, Your Honor.

1          THE COURT:  Mr. Sucsy?

2          MR. SUCSY:  I have no further questions.

3     The United States calls Tammi Woodall.

4          (Whereupon, the oath was administered by the Court.)

5          MS. WILLIAMS:  Your Honor, I don't believe I have

6  filed an official entry of appearance in this case.  If I have

7  not done so, I do so at this time.

8          THE COURT:  But you are here.  Okay.

9                    TAMMI WOODALL,

10  Testified on direct examination by Ms. Williams as follows:

11  Q.    Please state your name.

12  A.    Tammi Woodall.

13  Q.    Ms. Woodall, where do you live?

14  A.    2642 Minter Lane, Abilene, Texas.

15  Q.    How long have you lived there?

16  A.    Almost two years.

17  Q.    How long have you lived in the Abilene area?

18  A.    I have been here almost eight years.

19  Q.    Do you work outside the home?

20  A.    Yes, ma'am.

21  Q.    What do you do?

22  A.    I am a housekeeper at Super 8.

23  Q.    At Super 8?

24  A.    Yes, ma'am.

25  Q.    Who else lives with you at that Minter Lane address?

```
 1   A.   My niece Rebecca Johnson, Cody James, and Amy Johnson,

 2   and Betty Johnson.

 3   Q.   And all of those people that live with you, how are they

 4   related, if at all, to you?

 5   A.   Rebecca, Amy, and Cody are my niece and nephew, and Betty

 6   Johnson is my mother.

 7   Q.   Do you know a person by the name of Troy Powell?

 8   A.   Yes, I do.

 9   Q.   Is he in the courtroom today?

10   A.   Yes.

11   Q.   Would you please point him out for us?

12        You are pointing to the man in the orange jumpsuit to my

13   right?

14   A.   Yes, sir.

15             MS. WILLIAMS:  May the record reflect she has

16   identified the Defendant.

17             THE COURT:  It may do so.

18   Q.   (BY MS. WILLIAMS)  How do you know Mr. Powell?

19   A.   I know him because I have been raising Rebecca Johnson.

20   Q.   And who is Rebecca Johnson in relation to Mr. Powell?

21   A.   His daughter.

22   Q.   How long have you been raising Rebecca?

23   A.   I have had her for four years.

24   Q.   Is -- Because he is Rebecca's father, I mean, when did

25   you first meet Mr. Powell?
```

```
 1    A.    When Becca was first born.

 2    Q.    Okay.  How old is she now?

 3    A.    She is 17.

 4    Q.    Now, she was born to whom?

 5    A.    Tina James and Troy Powell.

 6    Q.    And Tina James is your --

 7    A.    Sister.

 8    Q.    Your sister?

 9    A.    Yes, ma'am.

10    Q.    How old was your sister when Rebecca was born?

11    A.    I don't recall, ma'am; young, very young.

12    Q.    Over 18?

13    A.    No.

14    Q.    Over 16?

15    A.    By a few months.  I am not sure.

16    Q.    By a few months over 16?

17    A.    Yes.

18    Q.    What is the age difference between you and Rebecca's mom?

19    A.    About nine months.  Nine years.  Sorry.

20    Q.    Did you know that Troy Powell was convicted of a sexual

21    offense?

22    A.    Yes, ma'am.

23    Q.    How did you know that?

24    A.    My mother had mentioned it to me a long time ago.

25          MR. PROPST:  Object to hearsay.
```

```
1              THE COURT:  Overruled.
2    Q.    (BY MS. WILLIAMS)  And that sex offense, does it relate
3    to a family member of yours?
4    A.    Yes.
5    Q.    Up until a few months ago, where did you know or
6    understand that Mr. Powell had been living?
7    A.    In Illinois.
8    Q.    How did you know he was living there?
9    A.    I had visited one time to see my mother and he was living
10   in Illinois.
11   Q.    At some time did you learn that he had moved here to
12   Abilene?
13   A.    No.
14   Q.    Okay.  When did you next -- When did you see him last?
15   A.    Before the end of November?  Is that what you are asking
16   me?
17   Q.    I am asking, yes, around the Thanksgiving time did you
18   see Mr. Powell?
19   A.    I am not understanding what you are asking me, ma'am.
20   Q.    Before court today, when was the last time you saw
21   Mr. Powell?
22   A.    A few weeks before he got arrested.
23   Q.    And if he was arrested on February the 5th of this year,
24   about when was it that you would have seen him here in
25   Abilene?
```

1    A.    End of November.

2    Q.    The end of November of 2013?

3    A.    Yes, ma'am.

4    Q.    Okay.  If Thanksgiving day was on November the 28th, do

5    you remember when in relation to that day you would have seen

6    Mr. Powell?

7    A.    I don't recall the date.  He showed up at my house to

8    deliver a TV to Rebecca, and that is when he showed up.

9    Q.    Did you know he was coming to your house?

10   A.    No, ma'am, I did not.

11   Q.    How long had it been since you had seen him when he just

12   showed up at your house with a TV?

13   A.    At least a year.

14   Q.    Where had you seen him, then, that year before?  Where

15   had you seen him?

16   A.    August.  It was in Illinois.

17   Q.    And then he showed up at your house sometime after

18   Thanksgiving with a TV for Rebecca?

19   A.    Yes, ma'am.

20   Q.    Was it after Thanksgiving and before Christmas?

21   A.    Yes.

22   Q.    Did you and Mr. Powell talk when he showed up with the

23   TV?

24   A.    Honestly, no, ma'am, because I was getting the children

25   ready for school and then I was on my way to work that

1    morning.

2    Q.    At some point after he showed up with the TV, did you

3    talk to him?

4    A.    Not really sat down and talked.  I was under the

5    impression that he was dropping the TV off and leaving.  I

6    wasn't aware of his plans.

7    Q.    At some point did you become aware of his plans?

8    A.    When he purchased the house in Tuscola and his truck HAD

9    been registered here, I was under the assumption he was moving

10   here.

11   Q.    When did you learn that he had purchased that house in

12   Tuscola?

13   A.    Shortly before he purchased he said he was looking at it,

14   but he wasn't -- He didn't know if he was going to get it yet.

15   Q.    He told you that?

16   A.    Yes, ma'am.

17   Q.    All right.  So when he got to Abilene and he came to your

18   house on Minter Lane, was that sometime around the last week

19   of November?

20   A.    I don't recall the date, but I am thinking it was the

21   last weekend of November.

22   Q.    Did he stay at your house?

23   A.    Yes, for three or four days.

24   Q.    All right.  And you saw him during that time?

25   A.    Yes, ma'am.

```
 1    Q.    After he left your house, where did you understand that

 2    he went?

 3    A.    I was under the impression he went to Clyde and stayed at

 4    my ex-husband's house.

 5    Q.    And did you learn that from Mr. Powell?

 6    A.    Yes, and my sister Tina had said that they were out

 7    there.

 8              MR. PROPST:  Object to hearsay.

 9              THE COURT:  Sustained on that.

10    Q.    (BY MS. WILLIAMS)  When he left your house, did he tell

11          you he was going to Clyde to stay with your ex-husband?

12    A.    No, ma'am.  I didn't know where he was going.

13    Q.    Do you know about how long he stayed in Clyde?

14    A.    I was under the impression three or four days.

15    Q.    And after that, where did you learn that he went?

16    A.    He had rented a motel on Highway 80 for about a week.

17    Q.    How did you know that?

18    A.    My sister Tina.

19    Q.    Okay.

20              MR. PROPST:  Object to hearsay.

21              THE COURT:  She hadn't -- Okay.  All right.

22    Overruled.

23    Q.    (BY MS. WILLIAMS)  After he rented the motel room on

24    Highway 80, did you become aware that your sister was staying

25    at the motel with him?
```

1    A.    Yes, ma'am.

2    Q.    Do you know about how long they stayed at the motel?

3    A.    For a week, I assume.

4    Q.    And then after that, did you become aware that he was in

5    the process or trying to buy that house in Tuscola?

6    A.    Yes, ma'am.

7    Q.    And did you learn that he did buy that house in Tuscola?

8    A.    Yes, ma'am.  He said he got it.

9    Q.    He told you that?

10   A.    Yes, ma'am.

11   Q.    Did you go out to that house?

12   A.    Yes, ma'am.

13   Q.    And when you went out there, did he tell you that he was

14   staying there?  Did he tell you he was staying somewhere else?

15   A.    I assumed he was staying there because all his belongings

16   were there.

17   Q.    And his belongings would include what?

18   A.    His clothes, his tools, his truck, his animals.

19   Q.    And when you say animals, what kind of animals are we

20   talking about?

21   A.    I don't know the breeds of them, but there was two.

22   Q.    Dogs?

23   A.    Yes, ma'am.

24   Q.    All right.  Were they his pets?

25   A.    Yes, ma'am.

1    Q.    Do you remember about when it was that he moved to that

2    house in Tuscola?

3    A.    I don't recall dates, but it was fairly quick after he

4    purchased it.

5    Q.    If he purchased the house on December the 26th, would it

6    have been fairly quickly after that?

7    A.    Maybe two or three days after that.

8    Q.    Sometime around the first of January?

9    A.    Yes, ma'am.

10   Q.    Because you have family relations with Mr. Powell, after

11   he moved into that house there in Tuscola, do you think you

12   would be aware of whether he had moved back to Illinois or

13   somewhere else?

14   A.    No, ma'am.

15   Q.    You don't think you would know that?

16   A.    Well, yes, ma'am.  I am sorry.

17   Q.    You would know that?

18   A.    Yes, ma'am.

19   Q.    Okay.  And did you ever become aware that he had moved

20   from that house in Tuscola to anywhere else before he was

21   arrested on February the 5th?

22   A.    No, ma'am.

23   Q.    After Mr. Powell was arrested, did he call you from jail?

24   A.    Yes, ma'am.

25   Q.    Has he called you numerous times from jail?

```
 1   A.    Yes, ma'am.

 2   Q.    And has he asked you to do things for him that he can't

 3   do for himself?

 4   A.    Yes, ma'am.

 5   Q.    What kind of things has he asked you to do?

 6   A.    Pay bills for him.

 7   Q.    What happened to the dogs at his house there in Tuscola?

 8   A.    The day he got arrested, he called and he asked me to go

 9   get them.

10   Q.    And why go get the dogs?

11   A.    Because there was nobody up there and he didn't want them

12   left there alone with no food or water.

13   Q.    You have been in the courtroom this morning and heard the

14   testimony of Deputy United States Marshal Ferguson?

15   A.    Yes, ma'am.

16   Q.    Did you hear him testify concerning what the Defendant

17   told him about where all he stayed after he got to Texas?

18   A.    Yes, ma'am.

19   Q.    You heard the deputy testify that the Defendant said that

20   he stayed in his truck, a hotel, 2642 Minter Lane, Nick's

21   house in Clyde, and then moved to 326 County Road 606.

22   A.    Yes, ma'am.

23   Q.    And is that consistent with what you knew about where the

24   Defendant had been since he arrived in Texas?

25   A.    Yes, ma'am, other than the truck.  I wasn't aware that he
```

```
 1   was sleeping in his truck.

 2   Q.   And the truck, tell us about the truck.  Did he come in

 3   the truck from Illinois?

 4   A.   Yes, ma'am.

 5   Q.   In what state was the truck registered when he got here?

 6   A.   Illinois.

 7   Q.   All right.  And did you become aware at some point that

 8   it had different license plates on it?

 9   A.   Yes, ma'am.

10   Q.   What license plates did it have on it the last time you

11   saw it?

12   A.   Up to this point?

13   Q.   Yes, ma'am.

14   A.   It is Texas.

15   Q.   Registered in the state of Texas?

16   A.   Yes, ma'am.

17   Q.   Did you have any indication that Mr. Powell was just

18   passing through Texas on his way to somewhere else?

19   A.   I thought he was up until he registered his truck and

20   purchased a home.

21   Q.   Do you have any reason to be untruthful or to dislike

22   Mr. Powell?

23   A.   Other than what he has done to Rebecca, no, ma'am.

24   Q.   All right.  Knowing what he has done to Rebecca, which we

25   haven't gotten into here, but knowing what he has done to
```

 1   Rebecca, is that causing you to lie today?

 2   A.   No, ma'am.

 3          MS. WILLIAMS:  I will pass the witness.

 4          THE COURT:  Mr. Propst?

 5                    CROSS EXAMINATION

 6   By Mr. Propst:

 7   Q.   Hello, Ms. Woodall.

 8   A.   Hi.

 9   Q.   I am Jeff Propst.  I am Mr. Powell's attorney.  We have

10   spoken on the phone, haven't we?

11   A.   Yes, sir.

12   Q.   The house out there on County Road 606, what was your

13   understanding of what was going to happen to that house?

14   A.   We had -- Troy Powell and I had discussed about me living

15   there with the kids.

16   Q.   Okay.  When you say the kids, you are talking about his

17   daughter?

18   A.   His daughter and the other two siblings, yes.

19   Q.   Okay.  And those other siblings are not his siblings.

20   Right?

21   A.   No.

22   Q.   But you actually have legal custody of Rebecca his

23   daughter.  Right?

24   A.   I have guardianship.

25   Q.   Guardianship?

1    A.   Yes.

2    Q.   She is 17?

3    A.   Yes.

4    Q.   Okay.  And your understanding was that that house was

5    being prepared for you and for Rebecca and the other two

6    children?

7    A.   At first I didn't, but as we discussed it and I looked at

8    it, yes, I was under that assumption, yes.

9    Q.   Okay.  You said that Mr. Powell stayed with you for about

10   three or four days?

11   A.   Yes, sir.

12   Q.   And then you have also testified that he stayed at a

13   motel and he stayed with your ex-husband and out at County

14   Road 606.  How often did you see -- How frequently did you see

15   Mr. Powell during this period?

16   A.   Sometimes everyday, sometimes every other day.

17   Q.   Okay.  Were you going to his -- wherever he was staying,

18   or was he coming to where you were staying?

19   A.   He was coming to my residence.

20   Q.   Okay.  And what would he do when he was there?

21   A.   He would hang out and visit and be on his computer and

22   come visit Becca.

23   Q.   Okay.  Were you giving updates to Marshal Ferguson about

24   where Mr. Powell was?

25   A.   No, sir.

1    Q.    Okay.  Now, you know that Mr. Powell has property in

2    other states.

3    A.    Yes, sir.

4    Q.    He has a house in Missouri?

5    A.    Yes, sir.

6    Q.    He has a house or some rental properties in Illinois?

7    A.    Yes, sir.

8    Q.    The house in Missouri, when did he acquire that?

9    A.    I don't know the dates.  I just -- I really don't know

10   much about the Missouri property.

11   Q.    Okay.  Is that something that you think he acquired

12   recently or within the last few months or years ago, or do you

13   have any sense of that?

14   A.    No, sir, I don't.

15   Q.    Okay.

16         MR. PROPST:  I will pass the witness.

17         THE COURT:  Ms. Williams?

18                    REDIRECT EXAMINATION

19   By Ms. Williams:

20   Q.    Ms. Woodall, did I understand your testimony to be during

21   cross examination that you have seen Mr. Powell in and around

22   the Abilene area everyday or every other day?

23   A.    When he was first here, yes, ma'am.

24   Q.    When he was first here.  So like when he got here the end

25   of November, the first part of December?

1    A.    Yes, ma'am.

2    Q.    And how long did that go on?

3    A.    I would say about a month, guessing.

4    Q.    Has anyone told you -- Let me back up.  Before Mr. Powell

5    was arrested, did anyone tell you how many days he would have

6    in any place or in Texas before he would have to register as a

7    sex offender?

8    A.    No, ma'am.

9              MS. WILLIAMS:  No further questions.

10             THE COURT:  Mr. Propst?

11                      RECROSS EXAMINATION

12   By Mr. Propst:

13   Q.    You said that it was about a month that you saw him

14   either everyday or every other day, and then after that what I

15   guess I am understanding you to say that you didn't see him as

16   frequently after about a month had passed?

17   A.    No, sir.  He was up at Tuscola working on the house, I

18   assumed.

19   Q.    Okay.  And as far as -- You said it was about a month.

20   Are you sure it was a month?

21   A.    Might have been two, I mean, because after I got a job in

22   December I didn't see him as often.  So if he came to the

23   house, my mother was there.

24   Q.    Okay.  But what you had testified to a little bit ago is

25   that for about a month you saw him either everyday or every

1    other day.  Right?

2    A.    It was probably up until he got arrested off and on from

3    in that time frame.

4    Q.    Okay.  Well, Ms. Woodall, and I am not trying to be

5    difficult, but now I think what I have heard you say is that

6    you saw him everyday or every other day for about a month.

7    A.    From November up until he got arrested.  It wasn't that I

8    seen him on a daily basis, but yes, I have had contact with

9    him, because he has called me from jail since he has got

10   arrested.

11   Q.    Okay.  We are not talking about after he went to jail.  I

12   am talking about before he went to jail.  Okay?

13   A.    I seen him sometimes everyday, sometimes every other day,

14   and like I said, when I got a job in December I really didn't

15   see him that much.

16   Q.    So you didn't see him every other day whenever you had

17   that job in December?

18   A.    No, sir.

19   Q.    Okay.

20   A.    And if I did, it was for a brief moment.

21   Q.    When did you get that job in December?

22   A.    I got hired December 4th.

23   Q.    Okay.

24         MR. PROPST:  No further questions.

25         THE COURT:  Ms. Williams?

1          MS. WILLIAMS:  Nothing further, Your Honor.

2          THE COURT:  Ms. Woodall, you may step down.  Thank

3     you.

4          MR. SUCSY:  Your Honor, other than asking the Court

5     to take judicial notice of the laws, and I do have some

6     printouts of federal law as well as Colorado and some Texas

7     material, which I provided to Defense counsel, and subject to

8     argument, the Government would rest at this time.

9          THE COURT:  Okay.  Any objection -- Have you

10    provided counsel what you are asking the Court to take

11    judicial notice of?

12         MR. SUCSY:  I have given him copies of the same

13    materials that I have here for the Court.

14         THE COURT:  All right.

15         MR. PROPST:  I have copies, Your Honor.  I would

16    address the material briefly.

17         THE COURT:  Yes.

18         MR. PROPST:  As far as the -- There is some

19    printouts of 42 U.S.C. 16911 and the sequencing after that,

20    which we don't have any objection to you taking judicial

21    notice of.

22       There is some printouts of Colorado statutes of the -- I

23    believe it is 18-3-405, which is the statute reflected in the

24    judgment in Exhibit 3.  We don't have any objection to the

25    Court taking judicial notice of that.

1        As far as the two documents referring to Texas law, one

2   of them is a -- There is a three-page document -- Excuse me.

3   Four pages that purports to show what they call substantial

4   similarity between the Texas offense, which would require

5   registration as a sex offender under Texas state law, and

6   Colorado offenses that the Department of Public Safety is

7   saying or is alleging here that those are substantially

8   similar.

9        We will not stipulate or acquiesce in the Court taking

10  judicial notice that these determinations are correct by the

11  Department of Public Safety.  Those are matters of law that I

12  believe the Court would have to decide, and I can address

13  that.  I think we do actually have some significant difference

14  between the Colorado statute of 18-3-405 and the Texas statute

15  of 21.11(a)(1), indecency with a child by contact.  And I can

16  address that in argument, but I just object to the Court

17  taking judicial notice of that.

18       The other document from Texas is simply a -- As I

19  understand it, it is simply a list of durations of time that a

20  person would have to register if convicted of particular Texas

21  offenses.  I don't dispute those.  I don't have any objection

22  to the Court taking judicial notice of them; only to the

23  document that attempts to show that the Colorado statute is

24  substantially similar to the Texas statute of indecency by

25  contact.

1              THE COURT:  Mr. Sucsy?

2              MR. SUCSY:  Your Honor, those are available for the

3    Court.  I would have to tell the Court that really I am

4    relying on federal law, primarily the first part of what I

5    have given the Court.  It is based on the elements of the

6    Colorado offense and how those are defined and evaluated as to

7    whether they constitute under the Adam Walsh Act under 18,

8    U.S.C. 2250, 42 U.S.C. 16911, the definition of a tier two sex

9    offender, what constitutes a sex offense, really that is what

10   we are relying on here, Your Honor.  The Texas provisions are

11   relevant possibly to what the Defendant might have found if he

12   had been looking online and researching as there is some

13   evidence that what he said he had done.  But those -- We are

14   not relying on the Texas statutes to establish the fact that

15   his Colorado conviction constitutes a sex offense requiring

16   him to register under federal law.

17             THE COURT:  All right.  I will take judicial notice,

18   then, of these items that the Government has requested that

19   the Court take judicial notice.

20        And with that you are resting?

21             MR. SUCSY:  Yes, Your Honor.

22             THE COURT:  Mr. Propst?

23             MR. PROPST:  Your Honor, we would ask for a judgment

24   of acquittal under Federal Rule of Criminal Procedure 29, and

25   I am basing that motion on the proposition to the Court that

 1     the requirement to register under SORNA, the violation of

 2     2250 -- 18 U.S.C. 2250 happens only if a person, in this case,

 3     in the case of a state offense, crosses state lines, comes to

 4     Texas in this case, and is required to register under Texas

 5     law.  SORNA, as I understand it, is a directive or a request

 6     to the states to implement certain standards, and at the -- If

 7     the state doesn't do it they are denied funding.  But,

 8     nevertheless, many states don't do it, and Texas is one of

 9     those, which is apparent from reading the Texas rules of

10     registration and comparing them to the federal rules of

11     registration.  It is also acknowledged on the SMART website

12     which is put out by the Department of Justice regarding sex

13     offender registration.

14         When a state is not in compliance with SORNA, then the

15     best that a person can do when it comes to the state and has

16     any duty to register is register under the laws of the State

17     of Texas, and that is addressed briefly in the case of *United*

18     *States versus Heth*, a Fifth Circuit case which is 596 F.3d

19     255.  The argument in *Heth* was that Mr. Heth argued that it

20     was impossible for him to comply with SORNA because Texas

21     hasn't implemented SORNA.  The Fifth Circuit rejected that

22     argument.  And that is not the argument I am making here

23     today.  But what they said in rejecting it was Mr. Heth knew

24     that he had to register under at least under state law and

25     Texas has a registration system under state law and he could

1    have registered under state law.  So, in other words, it

2    wasn't impossible for Mr. Heth to comply with SORNA just

3    because Texas hasn't implemented it.  He had to register under

4    Texas laws, and essentially do whatever was available to him,

5    which he didn't do.

6         In light of that language from *Heth*, my argument is that

7    the Court -- the Fifth Circuit is directing the Court's

8    attention to Texas law, or to whatever state law it is, if a

9    person comes there in order for that person to be liable under

10   SORNA, liable under 2250, the Government would have to show

11   beyond a reasonable doubt that the Defendant had a duty to

12   register in the state of Texas.  It has been addressed very

13   briefly, and the Government has asked the Court to take

14   judicial notice of a document issued by the Department of

15   Public Safety that purports to show a substantial similarity

16   between the Colorado offense that Mr. Powell was convicted of

17   in 1992 and the Texas offense of indecency with a child by

18   contact.  But part of the other documentation that was

19   provided to the Court just now and that the Court took

20   judicial notice of is the -- expanding on the law the Colorado

21   statute of 18-3-405, which says that a person who subjects

22   another, not his spouse, to any sexual contact commits sexual

23   assault.  That is 18-3-405.  That is the one that is reflected

24   in Exhibit No. 3, the judgment from Colorado.

25        Another document just submitted is the definitions under

1    those sections of the Colorado statutes, "Sexual contact means

2    the knowing touching" -- And this is in 18-3-401, definition

3    4.  "Sexual contacts means the knowing touching of the

4    victim's intimate parts by the actor,"  And it goes on to say

5    more.  And then intimate parts is defined in No. 2.  "Intimate

6    parts means the external genitalia or the perineum or the anus

7    or the buttocks or the pubes"--their words--"or the breasts of

8    any person."

9         I would -- The emphasis there that I would like to put is

10   the fact that that statute criminalizes conduct and makes

11   certain conduct registerable for sex offenses that Texas does

12   not so criminalize.  I would bring to the Court's attention

13   two Texas cases.  One of them is *Wright v. State*, which is 693

14   S.W.2d 734, 1985 case from Dallas where the very specific

15   argument there was the Defendant was accused of touching the

16   buttocks of the victim.  He was charged with indecency by

17   contact, which is the Texas statute that the Government is

18   trying to show that the Colorado statute is analogous to, and

19   the Dallas Court of Appeals said that the statute of indecency

20   by contact does not -- is not committed by touching the

21   buttocks.  There is a difference between anus and buttocks.

22        Furthermore, the Texas -- it is a Court of appeals case

23   from Austin, the Third Court of Appeals in Austin, 327 S.W.3d

24   898, and that case is styled *Texas Department of Public Safety*

25   *versus Garcia*.  In that case it was being litigated whether or

1    not a statute from another jurisdiction was substantially

2    similar to a Texas statute for the purposes of sex offender

3    registration.  And what the Court of Appeals said was that if

4    there is incongruity between the statutes as they are written,

5    that the Government would have to show that the offense

6    committed, the original offense committed, is -- based on its

7    facts falls under the Texas statute.

8         I appreciate the Court bearing with me.  I understand

9    that this is a long and winding argument.

10        The point, what I am saying is, there is a difference

11   that calls into question -- between the statutes of Colorado

12   and Texas calls into question whether or not Mr. Powell would

13   have a duty to register in the state of Texas.  The Government

14   has not met its burden and produced sufficient evidence to

15   show that that is the case, that he has a duty to register in

16   Texas.

17        I think that Mr. Sucsy is relying primarily on the

18   registration requirements in 18 U.S.C. -- or 42 U.S.C. 16913,

19   but those are only suggested minimum requirements that SORNA

20   is making to the states.  The actual substance of violating

21   2250 when we are talking about someone coming to Texas is they

22   would have to not be in compliance with Texas registration

23   law, and that is what the evidence that the Government has

24   introduced is insufficient to show.

25        For those reasons, we would show for a judgment of

 1    acquittal under Rule 29.

 2              THE COURT:  Thank you.

 3        Mr. Sucsy?

 4              MR. SUCSY:  This is an interesting argument, because

 5    in the *Lopez-Parker* case that is now up on appeal, the

 6    argument is being made the other direction there might have

 7    been error in that case based on any consideration of Texas

 8    law; that it only needs to be -- all of the definitions, the

 9    residency definitions, everything has to be determined under

10    federal law.  At least that is the argument.

11        Now, in this particular case we are relying on federal

12    law, and the statute, the last one that Mr. Propst referred

13    to, is entitled "Registry Requirements for Sex Offenders."

14    And it says, "In general, sex offenders shall register and

15    keep the registration current in each jurisdiction where the

16    offender resides, where the offender is an employee, and where

17    the offender is a student."  So I don't see how that is

18    conditioned, and that is the federal statute.

19        There is also, incidentally, before I forget, part of the

20    definition in 18, U.S.C. -- or 42 U.S.C. 16911 that defines

21    employment, and it was brought out by the Defendant that he

22    might have been employed in remodeling the residence or the

23    church that he had bought.  The definition includes, "The term

24    'employee' includes an individual who was self-employed or

25    works for any other entity, whether compensated or not."  So

1    in addition to residing here, presumably Mr. Powell was

2    employed in remodeling the residence or the church that he had

3    purchased.

4        But we can -- Without resorting to Texas law, there is

5    federal law from the beginning to the end of this case.  The

6    Defendant was convicted in Fremont County, Colorado of sexual

7    assault of a child, or on a child, as they term it, a class IV

8    felony, in violation of CRS 18-3-405, and the conviction was

9    pursuant to a plea agreement dated 9/25/92, although it was

10   later in the year than it was actually -- the judgment and the

11   sentence were entered.  His obligation, as I will show

12   shortly, will not expire until 2017.  We are not there yet.

13       The elements of the offense are stated on the last page

14   of the plea agreement.  "The Defendant in the state of

15   Colorado, on or about the date or place charged, knowingly

16   subjected another, not his spouse, to any sexual contact, and

17   the person was less than 15 years of age"--in this case his

18   victim was 14--"and the Defendant was at the time at least

19   four years older than that person at the time of the act"--in

20   this case the Defendant was ten years older.

21       "Under Colorado law, sexual contact means the knowing

22   touching of the victim's intimate parts by the actor, or the

23   actor's intimate parts by the victim, or the knowing touching

24   of the clothing covering the immediate area of the victim or

25   actor's intimate parts, if that sexual contact was for the

1    purpose of sexual arousal, gratification, or abuse."

2        And intimate parts is defined under Colorado law to mean,

3    "The external genitalia or the perineum or the anus or the

4    buttocks or the pubes or breasts of any person."

5        And the statute that Mr. Powell was convicted of tracks

6    the same elements that are set out in his plea agreement.

7    "Any actor knowingly subjects another, not his or her spouse,

8    to any sexual contact, commits sexual assault on a child if

9    the victim is less than 15 years of age and the actor is at

10    least four years older than the victim."

11        So the Court must look to federal law to determine if

12    Mr. Powell's Colorado -- I don't know that the Court

13    necessarily has to look to federal law, but the Court can look

14    to federal law in this case and determine if the Colorado

15    conviction constitutes a sex offense within the definition of

16    federal law requiring him to register as a sex offender under

17    the Sex Offender Registration and Notification Act.

18        And in that regard, Title 42 U.S.C. 16911 has relevant

19    definitions, the federal definitions.  "A sex offender means

20    an individual convicted of a sex offense.  16911 Subsection

21    (5) defines sex offense in the Amie Zyla expansion of sex

22    offense definition, it says, "generally, except as limited by

23    subparagraph (B) or (C)"--and neither of which apply in this

24    case because (B) deals with foreign convictions and (C) deals

25    with victims who were not at least four years younger than the

 1    Defendant--based on that law, "sex offense means a criminal

 2    offense that has an element involving a sexual act or sexual

 3    contact with another."

 4        And for the purposes of that Subsection (i) Section III

 5    states, "Tier II sex offender"--and that is what this

 6    Defendant is--a Tier II sex offender--"means a sex offender

 7    other than a Tier III sex offender whose offense is punishable

 8    by imprisonment for more than one year and the offense is

 9    comparable or more severe than the following offenses when

10    committed against a minor, or an attempt or conspiracy to

11    commit such an offense against a minor."  Abuse of sexual

12    contact is under Subsection (4) as described in Section 2244

13    of Title 18.  So we are still just going under federal law.

14        Going to 18 U.S.C. 2244, it is titled, "Abuse of Sexual

15    Contact."  To define what that would have to be, the statute

16    says, "Sexual conduct in circumstances where sexual acts are

17    punished by this chapter, whoever in the special maritime and

18    territorial jurisdiction of the United States, or in a federal

19    prison, or in any prison institution or facility in which

20    persons are held in custody by direction or pursuant to a

21    contract or agreement with that of any federal department or

22    agency, knowingly engages in or causes sexual contact with or

23    by another person, if so to do would violate Subsection (a) of

24    Section 2243 of this title, had the sexual contact been a

25    sexual act."

1      So it is sort of -- You have to go from one statute to

2  the other, but now we go to 2243(a), because we are looking at

3  sexual contact, not a sexual act.  And that is titled, "Sexual

4  abuse of a minor or ward."  And it says, "Whoever, in the

5  special maritime or territorial jurisdiction of the United

6  States or in federal prison, or in any federal prison,

7  institution, or facilities in which persons are held in

8  custody by direction of or pursuant to or a contract or

9  agreement with the head of any federal department or agency,

10  knowingly engages in a sexual act with another person."  The

11  statute uses the term sexual act, but 2244 said we replaced

12  that with the concept of sexual contact here "with the person

13  who has attained the age of 12 but has not attained the age of

14  16.

15      And so what we are looking for is something that is

16  substantially similar to this scenario--sexual contact and a

17  victim who has attained the age of 12 but not 16--and that is

18  exactly what we have the Defendant convicted of in the

19  Colorado case--and is at least four years younger than the

20  person so engaging.  And here we have a Colorado situation

21  with -- the language in that regard four years is identical,

22  and that the -- There is an escape provision under the federal

23  law, SORNA, of the victim being less than four years.

24      Under the Texas statute, it just requires that they be at

25  least three years younger, so there are situations where you

1    could have a federal or a state conviction which would not

2    constitute a SORNA sex offense.   That is not the case with the

3    Colorado law and the circumstances we have here.   Obviously

4    this Defendant was ten years older than the victim.

5         And then 18 U.S.C. 2246 (3) defines--and now we are

6    looking at the federal definition; not the Texas definition,

7    but the federal definition for purposes of applying these

8    federal statutes--defines sexual contact.   And we have the two

9    categories--sexual act or sexual contact.   "Sexual contact

10   means"--and this is 2246 Subsection (3)--"means the

11   intentional touching, either directly or through the clothing

12   of the genitalia, ANUS, groin, breast, inner thigh, or

13   buttocks," which is what Defense was arguing is not included

14   in the Texas law.   It is included in the federal law that is

15   substantially similar to the Colorado statute.   "Or the

16   buttocks of any person with intent to abuse, humiliate,

17   harass, or arouse and gratify the sexual desire of any

18   person."

19        So based on this road map, it is quite clear that the

20   Colorado statute that Mr. Powell was convicted of is

21   comparable to the offense referenced in 18 U.S.C. 2244, which,

22   in turn, refers to the 18 U.S.C. 2243(a) dealing with sexual

23   contact of minors between the ages of 12 through 15, or 12

24   through 16 in the case of the federal statute.

25        And finally, federal law requires persons convicted of

1    such sex offenses and were, thereby, Tier II sex offenders,

2    per federal law, to register for a period of 25 years.  And

3    that is in one of the -- in the laws that I provided the

4    Court.  And so the 25 years obligation has not expired.  The

5    Defendant was here very clearly even, just by -- I mean, we

6    have danced around it, but going back, the other witnesses who

7    say he was here from the end of November until he was arrested

8    in February, and that is well over 30 days.  And on top of

9    that, his -- under federal law he has three days once he

10   becomes a resident, when he buys a house and starts living

11   there, I say he has three days to register.  He bought that

12   house on the 26th of December of 2013, and he was arrested on

13   the 4th or 5th of February of 2014.  He had gone well over

14   three days.

15        And there is a general definition in some of the

16   footnotes that I am sure the Court is aware of that in some

17   federal context the habitually residing can refer to a 30-day

18   period.  But in this case he bought a house and was very

19   clearly a resident and had three days from that point.  But

20   even going by the 30-day definition, he was here well over 30

21   days.  And in his own statement, he was living in his truck,

22   he was living on Minter, he was living all these different

23   places, Clyde.  All of these are here.  He was habitually

24   living here from -- based on his own statement, from the

25   middle of December, second week in December, making it the

1   shortest time, until the very first part of February.  That is

2   well over 30 days.

3        So however the analysis is conducted, however you look at

4   it, he lived here long enough as a resident, and possibly

5   apparently as an employee for himself working in remodeling a

6   house that he had bought, long enough to require him to

7   register under federal law.

8        That is all I have, Your Honor.

9             THE COURT:  Okay.  Thank you.

10       Did you have any evidence you intended to present?

11            MR. PROPST:  No, Your Honor.  We rest.

12            THE COURT:  Okay.  All right.  And you close?

13            MR. SUCSY:  Your Honor, I close.  And I apologize if

14   I went beyond what was -- responding to his Rule 29.

15            THE COURT:  I gathered we were already there after

16   listening to Mr. Propst.

17            MR. SUCSY:  That is all I have in the way of

18   argument as well, Your Honor.

19            THE COURT:  Anything else you wanted to add as far

20   as the argument, Mr. Propst?

21            MR. PROPST:  Briefly, Your Honor, we would ask for a

22   ruling on the motion.

23            THE COURT:  I deny the Rule 29 motion.

24            MR. PROPST:  And I think the evidence -- Mr. Sucsy

25   has said that he was working here and remodeling.  I think the

1    evidence from the witness stand was that Mr. Powell was

2    preparing that house for Ms. Woodall and his daughter to live

3    in.  I am not sure that meets the definition of employment as

4    far as SORNA is concerned.

5         And, furthermore, not to belabor the point, but all of

6    the things that the Government has quoted from the definitions

7    of the statutes from federal law, that would be relevant,

8    maybe even dispositive, if Texas was compliant with SORNA.

9    The fact that Texas is not compliant with SORNA forces us to

10   turn, with the guidance of the *Heth* opinion from the Fifth

11   Circuit, forces us to turn to Texas law.

12        And I am not asking the Court to decide that Mr. Powell

13   wasn't required under Texas law.  My point is the Government

14   has the burden of proof and the Government didn't produce

15   sufficient evidence to persuade the Court that Mr. Powell had

16   a duty to register under Texas law, because of the difference

17   in the statutes and because of Texas case law on the matter.

18   Without proving that, they have not proven that he violated

19   2250.

20             THE COURT:  Thank you.

21        Anything else, then, Mr. Sucsy?

22             MR. SUCSY:  No, Your Honor.

23             THE COURT:  Well, let me take a look at what you

24   have cited, the cases that you have cited and the statutes,

25   and we will come back after lunch and I will give you a ruling

1    on the case.  Why don't we be back at 2:30, and give me a

2    chance -- take the lunch break and then give me a chance to

3    read what the parties have cited here.  And we will be back at

4    2:30.

5                        (Lunch recess.)

6              THE COURT:  Be seated.

7         Mr. Propst, what is your argument -- If I understand your

8    argument correctly, you are saying the Government -- In order

9    to obtain a conviction in this case, the Government has to

10   prove that your client Mr. Powell was required to register

11   under Texas law?

12             MR. PROPST:  Yes, sir.

13             THE COURT:  And what is the basis for that argument?

14             MR. PROPST:  The basis for that is primarily from

15   *United States V. Heth*, which -- it is dicta.  I don't know --

16   It is not the main point of the opinion, but it follows from

17   that opinion that if a state hasn't complied with SORNA, such

18   as Texas, then the Defendant can only register in that state

19   under the laws provided, and the laws -- Therefore, you would

20   look to Texas law to see if he was required to register here,

21   in which case, you know, if he was required and didn't

22   register, he would be guilty of 2250, but if he is not

23   required to register --

24             THE COURT:  But they didn't address that issue in

25   *Heth* at all whether he was required to register first.  The

1    conviction was under SORNA in that case, as I understand it.

2    Correct?

3              MR. PROPST:  It was.

4              THE COURT:  And there was no requirement there that,

5    in fact, there had to be a showing by the Government that he

6    had to register under Texas law before they could obtain a

7    conviction under SORNA.

8              MR. PROPST:  Well, they didn't address that

9    directly.  *Heth*'s argument was that he can't comply with SORNA

10   in Texas because they haven't implemented it, and the court

11   said, no, we reject that argument.  What you could do, even if

12   they haven't implemented, what you can do is you can comply

13   with the Texas registration laws.  And that is my basis from

14   that that the rest of my argument follows.  They even cited

15   the Texas Code of Criminal Procedure, Chapter 62, saying this

16   is what you could have done--complied under that.  And

17   everything else that I say follows from that--the idea that he

18   has to comply under Texas law because that is the only thing

19   available in Texas.

20             THE COURT:  Okay.

21        Mr. Sucsy?

22             MR. SUCSY:  Looking at the opinion, I mean, I don't

23   see that the argument is addressed at all.  I don't see how it

24   supports --

25             THE COURT:  I don't see it either.

1          MR. SUCSY:  There is even a statement in here citing

2    *Whaley*, a case actually out of Lubbock, but it says, "Noting

3    that all states and the District of Columbia had sex offender

4    registration laws prior to SORNA," and it is beyond dispute

5    that Colorado had a sex offender registry.  Texas also has a

6    sex offender registry.  And so, I mean, it is even

7    acknowledged in these opinions.  I don't really understand how

8    the argument can be made that we have an obligation to show

9    this Court at this hearing that it was possible for this

10   Defendant to register.  I don't think the issue has been

11   raised that it is impossible.

12          THE COURT:  Well, one of the issues there that they

13   raised -- they state twice in there that the fact that the

14   state hasn't implemented SORNA does not mean that you can't

15   violate SORNA.  You still have to comply with SORNA even if

16   the state hasn't implemented it.  They state that at least

17   twice in the opinion.  I just don't see -- I was trying to

18   find where you were getting there.

19       I understand your argument, but I don't see that case

20   lending any support for that.  Any other place where you were

21   getting support for that argument?

22          MR. PROPST:  Well, just in the text of SORNA itself

23   in 42 U.S.C. 16913 starting with -- Just one moment, Your

24   Honor.  Actually 42 U.S.C. 16911 defines the sex offender

25   registry, "The term sex offender registry means a registry of

1    sex offenders and a notification program."  Then definition

2    (10) is "Jurisdictions.  A jurisdiction means a state," and

3    several other things.  And 42 U.S.C. 16912 says -- is where

4    the SORNA is commanding, or I guess requesting at the threat

5    of withholding funding, that states maintain a registry.  It

6    says, "Each jurisdiction shall maintain a jurisdiction-wide

7    sex offender registry conforming to the requirements of the

8    subchapter."

9             THE COURT:  And how does that get you where you are

10   going?

11            MR. PROPST:  Whenever they talk about the registry,

12   maintaining the registry, and the defendant's duty to maintain

13   the registry and to keep it current, when they refer to the

14   registry they are referring to the local registry, and the

15   local registry is governed by the local laws, and that is why

16   the Government has to show that he is required to register

17   under Texas law.  He can't have violated 2250 --

18            THE COURT:  That provision that you reading, that is

19   the provision where SORNA is trying to mandate to the states

20   with the threat of withholding federal funds to implement

21   SORNA.  But, again, I don't find from that language -- Because

22   in that *Heth* case they stated even if the state hasn't done,

23   that you still can be in violation of SORNA whether they have

24   done that or not.  I don't see that being support for the

25   argument where you are going that the Government has to prove

1    that Mr. Powell, or anyone else, has to register under Texas

2    law before they can be found guilty for a violation of SORNA.

3    I don't see that that follows.

4         All right.  Anything else?

5              MR. PROPST:  No, Your Honor.

6              THE COURT:  Okay.  Well, I have considered the cases

7    you have cited.  As I have stated, I don't believe that they

8    lend support for the argument you are making that the

9    Government has to show that Mr. Powell had to have registered,

10   or even that he didn't qualify to be registered, as you are

11   arguing, because of the difference in Colorado law versus the

12   Texas law in terms of the indecency with the child and it

13   doesn't have quite the same definition.  Of course, the

14   statute talks about substantial as the civil cases, state

15   civil cases you cited point out.  I just don't think that is

16   an issue for this case.  I think the Government, as Mr. Sucsy

17   has been arguing, is going directly under SORNA.  They are

18   entitled to do that.  The have standing for that proposition.

19        On that basis, I think they have sustained their burden

20   in this case, the Government.  I am going to find the

21   Government has shown Mr. Powell was, in fact, living here,

22   intending to reside here in Taylor County, Texas, Northern

23   District of Texas, and that he failed to register within 30

24   days as required, and so he violated the provisions of 2250 as

25   alleged in the indictment.

 1          Mr. Powell, I will find you guilty, then, on the offense

 2    alleged in Count 1 of the indictment for failure to register.

 3          Anything else we need to address?

 4              MR. PROPST:  No, Your Honor.

 5              THE COURT:  Mr. Sucsy, anything else we need to

 6    address?

 7              MR. SUCSY:  No, Your Honor.

 8              THE COURT:  We will issue a sentencing scheduling

 9    order.  Likely we are looking at sometime in August or early

10    September as far as when the PSR will be ready and I will be

11    back.  But we will issue a scheduling order with the dates on

12    there.

13          Okay.  Court is adjourned.

14              (The proceedings were concluded at 2:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              10/23/2014

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25